and Rivera. Good morning your honors. My name is Jane Myers and I represent Robert Pizarro on this appeal. I want to start out by saying that the conduct here on the part of the government was simply outrageous for any number of reasons. They had these fully exonerating statements for ages and ages, years, before they were basically forced to turn them over. There was nothing difficult in turning them over. You just stick them in a pile that's called Brady and they're ready for you and ready to go at any time, while still holding these things close to the chest. But a very good district judge stepped in and while in another case she thought it was appropriate to dismiss, in this case having seen everything said there was enough time, things could be brought in and that is enough so that the trial could be held and was basically fair. And isn't that in the end the answer that the government was darn lucky that it was such a good judge because of what had been done below. But there was a fat judge. Why should we throw things out? I disagree with Judge Nathan on this but she's clearly a terrific judge and reading 5,500 pages of the record gave me a good sense of what is going on with her intelligence and common sense. I would say that it is enough. It is not enough to excuse them from this misconduct because it was just so bad. I think that she was in The argument is that the dismissal should be a punishment to the government for misconduct but was there prejudice in the trial? There was prejudice. What did that consist of? The prejudice is only in the sense that it was in the Sammy Lecker case, Lecker versus Portuando. You don't know what could have happened, what would have been brought up had it not been for this sudden change of theory, these sudden things going on. The theory that I am most enamored with, if that's a proper way of saying it, is that at this point with these prosecutors having done it over and over and over again, what happened here combined with what happened in the NEDJA case and the two cases that preceded these things to which the Anyway, that's also an argument about sanction for the government. But in terms of whether the trial that happened here was fair, you're saying the prejudice would be that if we had gotten it earlier, who knows, we would have had a smoother operation and maybe it would have been better. But you can't identify some defect in the, like some piece of evidence you did not have access to or some argument you couldn't make in the trial. Yeah, I am not able to give a specific piece of evidence or something of that ilk to the court on that point. Your main argument is that this was so bad that the government must be punished. And the question then also is, okay, does the punishment have to be, government have to be punished in every case, if in a series of cases they did this, or can a district judge figure that it is giving enough of a signal to the government that they'd better not do it again by picking the right case to do that in and holding it on its back because Judge Nathan certainly was not gentle with the government in this case. But that was enough for that, and this trial could proceed. I think Judge Nathan was turned out to be incorrect on this because she said, basically, this is awful what you've done. It's awful for, you know, the following eight reasons. And then said, the chief of the criminal division came in and said, we'll never do this again. We considered a training problem as opposed to a training and knowledge problem, but whatever. She found that it was negligence and not intentional flagrant misconduct, right? That's correct, but that is a mixed question of law and fact, and we think that she was wrong on that. Negligent, where the government is repeatedly misrepresenting to defense counsel and to the court that they have complied with all their Brady obligations. When the government comes up with this really bogus theory of law saying, listen, we've decided it's not credible because our confidential informant took control of someone else's cell phone. But you are arguing for the equivalent here of an exclusionary rule. You are arguing that because of this, the evidence, in effect, we do the same as in an exclusionary rule and have a trial which, let us assume for the moment you say no, was fair, should be thrown out because of this. And I would suggest to you that there are too many cases that show what the problem is with using such a rule as an absolute, because when we use it that way, we tend then to say that things are okay, which are not. And here is a case instead where the trial judge says, okay, basically we can go ahead. Even votes on bad behavior occur. Isn't that a much more sensible result? I think these cases will be evaluated individually. And certainly what the judge did in this case, which was something she had the power to do, it didn't work out. The next case she tries is even worse in terms of this. And by this point, you know that something very wrong is going on in the office. There were two cases before. There was Mr. Pizarro's case, and then there was, I'm not sure how you pronounce it, Nejad. Nejad. Nejad, yeah, which was even worse. They're not getting it. And sometimes dismissal, which you may think of as exclusion, may be the best thing. But that's what they did in the Nejad case. In other words, they chose the case that they thought was the right one to give the extreme penalty without saying that we have to do it all the time. I don't think they have to do it all the time. And I also think that Nejad was different in that the judge was referring these prosecutors to possible disciplinary action. What are they going to say? Go along with that, I think. It was a particularly good case to do with him. That's why they did it. I think Judge Calabresi is trying to get you to say, so what is it about this case that justifies that kind of a sanction? You said you're not going to have to do it in every case. So what are the factors that one would apply to determine when it's done and why does that apply here? I would basically use all the factors that it wasn't difficult to do this. You should have known it. You shouldn't be relying on bogus theories of law of how you get evidence in. If it's alternative perpetrator evidence, you shouldn't be opposing every single request for continuance on this, for an adjournment of it. You shouldn't be... I had some more directly in my mind, but none of the above occurred. They practically had to pull it out of the government to get this information, and they're repeatedly misrepresenting it. It was more than pretty bad. It was egregious and it was outrageous. That's your argument. Thank you. Thank you, Counsel. Mr. Langrock. Thank you. Please, the Court. My name is Peter Langrock. I'm from Middlebury, Vermont. I'm assigned to this case. I've had the privilege of arguing before this Court for over 60 years, and this is the first time I've ever argued actual innocence. And let me tell you, there's points in my brief which I think are valid points, but no point in arguing them. There's only one point here which I think I can help, and that is the prejudice brought about in this case under the Brady problem. We have to show prejudice. You have to understand that there are two theories in this case. One is a robbery gone wrong, and one is an assassination. I've talked to many people. I've let this out. Every single person I've talked to, when he looks at this objectively, thinks it's an assassination. If I had been trial counsel, and I still spend more time in trial than I do in the appellate courts, I know how I would have handled this. The first thing I would have done if I had known this is I'd have had a come-to-Jesus talk with my clients. I'd say, you know, the state has proven and proved that you were observing the situation, that you were planning a robbery. They've got a good case. And they're saying, we didn't kill him. They're telling the truth. They didn't kill him. But they are afraid to say, we were there. We were going back and forth looking at him. We had planned the robbery. We had done another robbery. If this were a conspiracy to rob, we wouldn't be here. What happened is the crazy confluence of events where the trial was scheduled two weeks away, and two assassins were assigned, as per the information coming from Gillian, to kill him. And our clients would have robbed him at a given time. That's my situation thinking here. But they didn't have the chance to because he was dead. And so what I would have done, what I could have done. What you say is plausible, but wasn't there enough evidence on which a jury could find real? Well, if you look at the evidence, let's take the two, I mean, I can go, I raised 20 points, questions in my brief. They're legitimate questions. But if they had looked at that, you know, the thing is they had a good thesis. The scientific method says you challenge the thesis. You challenge the thesis. They never challenged it. They suppressed it. And they continue to suppress it. Who's they who's challenging whose thesis? Excuse me? Who's challenging whose thesis? It's the duty of, I think, the government when they have a thesis. We're in a system that's supposed to look for truth and justice, not just convictions. And my mentor is Carla Willen. And it taught me professionalism and taught me the responsibility of the prosecutors. And I think they abdicated that in the situation. Just an example. Between the time of the first trial and the second trial, they furnished 3,500 material, which they hadn't furnished. Two million gigabytes of material. Two million gigabytes. Why wasn't that beforehand? What was it sorted out? It's not part of the record. I didn't go through all of it. I went through some of it. But wasn't there evidence of fingerprints, of DNA, of cell phones, and specifically the evidence of aims, who might be believed or not, but that isn't for us to say. They had a good case up until the time of the killing. If they were surveilling his car at the place of work, they must also have been looking at other places. If they thought he had a million dollars stashed away, they would have been following him. There are all sorts of opportunities for that to get into the car. My client's suggestion... But there was evidence that he was sitting in the car, that the person was there. But that wouldn't be where you'd put a body. Now, I'm not saying I would buy it. But, again, under our cases of what goes to a jury, isn't that enough? Your Honor, you... I mean, I understand what you're saying, but if you had argued it, you think you could have convinced the jury. I'm cocky enough to think that if I had this case from the beginning and I had that information, these people would not be convicted here today. But that isn't our standard. Well, the standard is you ask what is potential prejudice. And if it's potential prejudice that one trial can say that in good faith before this court, that indicates the potential prejudice why Brady in this case... Well, but how did the Brady fact give that prejudice if, by the time the trial took place, all the evidence that was suppressed improperly under Brady was then in? When you're in the defense counsel, when you have an alternate perpetrator situation, you have to, in effect, become a prosecutor. Your job is to convince the jury that somebody else did this. And that's a tough job. And it's an extremely tough job when you don't have the information. When you don't have the power of the government. You don't have grand juries. You don't have a guy out of jail, free cards. You don't have all the other things that they have to get the situation. And what you have here, not only that, is they suppress it. They don't even tell you about it. Four days before trial, you say, oh, how do you go back to a client who's told you all the time that I didn't do it, but wouldn't dare tell you that they were going to rob the guy? And you say, change your story. Well, there's a difficulty with the client that would exist regardless. So I guess what I'm struggling with is why the Brady violation is what caused that prejudice. So are you saying you didn't have enough time? Even though you got to do a trial with the evidence that you should have had more time? You're given a cold case as a prosecutor. Do they ask for more time than Judge Nathan allowed? Anybody, whether it be the TV or the situation, will tell you a cold case is not the same as a hot case. You don't have the same abilities to trace down things. The potential witnesses, the other investigations, the things that are there, there's so much that we don't know about. One of the things we don't know about is Alston was one officer. Bad apple. He was convicted. I've never known a barrel of apples with only one bad apple in it. What information is out there? But so just to connect it to the Brady violation, you're saying if the Brady material had been shared sooner, you would have had more time to work on this, and maybe it would have turned out better evidence. Is that the idea? In reality, what they gave us was dead stuff. There was nothing you could do with it. I mean, you couldn't develop the type of situation. And you also, in the situation, had to change theories in midstream. You didn't have the ability to talk to clients. I mean, realistically speaking, from a trial standpoint, from a lawyer standpoint, you're handicapped. And you've got a short period of time to completely change your situation. They did a good job. They tried to show the situation, but it was so far from where it could be. You're saying essentially that Judge Nathan was wrong in judging that the amount of time that was given to overcome clearly bad Brady violations- More than that, Your Honor. Was not sufficient so that you could make a really good argument. That's your argument. No amount of time. No amount of time could have corrected the things it could have done before. That's one of the problems. You're saying that by the time you got the Brady information, it was stale because it would have been better if you got it in a timely fashion and you could investigate in the moment. Is that your argument? I'm sorry. The information was essentially stale by the time you got it. Stale. If you go back- Could you give me some more specific sense of what is the case you would have put on or the kind of evidence you could obtain if you had gotten it sooner? Could possibly have gotten witnesses to the Gilliam's testimony. Could possibly have gotten testimony- You are saying that not because, not to punish the government as the prior lawyer was powerfully arguing, but because this kind of violation is so serious that there is no way that a fair trial could occur. Absolutely, Your Honor. You know, I think about, you know, as a trial lawyer, you dream about cases- I'd love to try this case. I heard Judge Jacobs many years ago in a case of that, say that and reach that conclusion as a trial lawyer. I'm not a trial lawyer, so I'm more at a disadvantage. Just a moment. You answered my question. You said you could have gotten testimony from certain parties that you couldn't get otherwise, so could you just finish that answer? As time goes by, there are additional charges brought. They were lawyered up. The situation with other people that might- Weren't all the relevant people represented by, what is it, August 2017, I think? They weren't all lawyered up when the information first came into the state's hands. And, you know, even lawyering up changes. You know, the type of thing I would have done would be I'd go to the U.S. Attorney's Office and say, I have a proffer. My clients were involved in a plan to rob these people. They're scared to hell. They didn't do the homicide. I might even offer to give them a polygraph, which wouldn't have a legal standing but might have a moral standing. There are a dozen things that I- But nothing prevented them from doing that as it happened, right? Doing it back then myself? We didn't know about it. You mean after the trial was continued in the four-month period? Yeah. Couldn't they have- Couldn't you have had- Yeah. Had you been counsel, you could have had polygraphs despite the bravado. You could have- What is it- I think Judge Menashe is trying to find it. What is it that you could have done but could not do because of a violation? The question is, could I have done it effectively? You know, there's just- even memories. You know- Even though in this trial you could have still gone to the U.S. Attorney and said, my clients are scared to hell.  It's not going to be as persuasive if you do it so late in the proceedings than if you had done it at the outset? Is that the- At the outset, when I talk to my client who says, I didn't do the killing, I had nothing to do with it, and so you're repairing your case based upon the situation, the usual situation, the state can't prove its evidence. Let's just focus. You are now saying that your conversations with the client would have been, at the beginning, and therefore in doing the whole thing, would have been different if you had the Brady material than if you did not. Absolutely. And that that conversation was so important that it fouled the whole case. Absolutely right. Am I saying your argument correctly? Absolutely right. And that's one of the- that's not the only part, but that's one- I mean, that's the- one of the defense counsel you have is nobody's going to say that they killed somebody. Everybody's going to say, I didn't do it. And so you build a defense based upon whatever you can stop. But you don't have that. You don't know. Instead, you have here an alternative situation where you can take the aggressor and say, listen, tell me the truth. Give me the background. And so that I can have some- I'm sorry, but, I mean, you had all the evidence that you're saying that there was evidence that they were planning a robbery, right? So you had that evidence. Yep. So a lawyer could not have had the conversation with his client at that time to say, look, there is all this evidence you're planning a robbery. Why don't you level with me? You were there doing something. Because- If you did the robbery and not the murder, then you should tell me now. Why couldn't you still have that conversation? You could have that conversation, but you don't have this part to it. You say, tell me the truth about this. And they're going to say, they're going to know the only evidence they have puts us there. The only evidence they have is showing that we're robbing. If you have an alternative, say, we now know who really did it. We now have somebody who says, who pointed out, who gives names, gives this, which- And if there's evidence that's putting you at the scene of a murder, isn't that pretty compelling? Can you have the same kind of conversation with the same kind of stakes involved? But you wouldn't be able to discuss with them that there is somebody else out there they can point a finger at. There is some place else. If I'm sitting here- You're saying you can't. We wouldn't be able to make a compelling argument to your client that that kind of a defense would work. That's what you're saying. I wouldn't have a defense because I wouldn't have the knowledge of the alternate perpetrator. And the state tried to even prevent any indication of that even when they had the information. Let me try to put it another way. You're saying that you were there talking to your client, and at the time there is clear evidence that they did the robbery, and that the people were killed, and that they were there at the scene, and that there's no indication of anybody else. Under those circumstances, the best you can do is to try to say that you weren't there at all or not. If instead at that time you had the evidence that was suppressed, that other people did it, you would then say something very different to your client, say, admit the robbery because we got a good argument with respect to the murderers. Is that the argument? That's an argument. Okay. There's a very good case up until the time of the killings, up to the time that night against my clients of being there. There is no evidence thereafter. There's no evidence of where he was killed, the evidence of Triskin about the size. Just look at the video of the two men that dressed in garbage bags or tattooed garbage bags and spent 40 minutes doing it. It's totally consistent with an assassination, totally inconsistent with my client. The grooming of the witness, they were over six-foot black people on the 9-11 call. Now my guy's a five-foot-seven Hispanic. They don't mesh. Everything, and the 20 points that I raised in the brief, all give questions that are legitimate questions that could be asked and followed up with. I can't tell you how each one would be followed up with had it come earlier, but there's so many subtle differences, so many things that can happen. And we just didn't have that information. We couldn't prepare a whole concept of, damn it, you've got the wrong guy. Thank you. I think we have your argument. Thank you. We'll hear from the government. Your Honor, you've got many things to say, but I hope at some point you will tell me what all the evidence was of the murder, that they did the murder. Yes, Your Honor. What the specific evidence of it. Somewhere in Europe. Yes, Your Honor. May it please the court. My name is Jason Swergold. I'm an assistant United States attorney in the Southern District of New York. I represent the government on appeal, and I represented the government at trial. And, Your Honor, I can start with your question about the evidence. I think it's an important place to start because at the end of the day, the lack of prejudice to the defendants in this case is fatal to their arguments to dismiss the indictment, no matter what theory they're advancing for why it should be dismissed. The evidence with respect to these two defendants was overwhelming. And it doesn't just start in 2016. It starts in 2015 because you have testimony from a cooperating witness that Robert Pizarro had a years-long plan to target Robert Bishon, the victim, because he was somebody who was known to be a very successful drug dealer who was believed to have a million dollars in drug proceeds stashed away. And so Pizarro started this campaign in January of 2015 when he robbed Bishon in his shop. And the evidence of that was particularly compelling. You had testimony. All this is testimony of robbery. What I want is your evidence of murder. So the evidence of murder, Your Honor, is that when you fast forward to 2016, for the weeks leading up to September 20th, 2016, there is one black SUV that on multiple occasions sits outside of the defendant's shop. Every time that car shows up, Pizarro or Rivera or both of their cell phones show up in that area, and every time it leaves, their cell phones go away. When an NYPD cruiser goes by with a mobile license plate reader on one occasion, it hits that car and comes back to Pizarro's car. That pattern happens every single time the car is there, including on the day of the murder. And then the two people who get out of that car go into the shop, bind all three people with zip ties, and we have the testimony from the two people inside who survived about what happened, how the defendants were interrogating Bishon about his money, about how Bishon said that he was a federal informant, about the way that those two defendants then reacted to it by stuffing the two remaining victims bound into the trunk. You then have the video from outside the shop showing all three of them leaving in the same car that was parked right outside of the shop, which is the victim's BMW. That car makes a U-turn. It then stops next to the black SUV where Robert Pizarro gets out and goes into his car. Rivera continues to drive the victim's BMW right behind Pizarro's SUV as it leaves. Rivera's DNA is recovered from inside that car on the steering wheel and on the gear shift. You then have video from outside the Horace Mann School showing the location in the Bronx where you can see the two vehicles through the trees come up, where they park the victim's car while the SUV waits, and then the SUV leaves. And then you have, within an hour, the NYPD locates that victim's car and finds Robert Bishon in the back seat with his hands bound and a zip tie around his neck, and he is strangled dead. And there is absolutely no evidence that existed at the trial or that could have ever been presented that anybody other than these two defendants committed that murder because the video was preserved from that night. It was preserved from the six months leading up to that night. And the only people who go in the shop that night are the two surviving victims, Robert Bishon, the deceased victim, and the two defendants. And so when Mr. Langrock talks about the 20 questions in his brief, those are not questions that are answered by the Brady question. Those are questions that are presented to a jury in which a jury weighs arguments, weighs credibility, and makes determinations. And the defense here presented a forceful alternative perpetrator theory based, by the way, on evidence that had been produced to them months before the trial was ever scheduled to begin and on a number of stipulations that the government agreed with them about the connections between the victim and the corrupt police officer. But you agree that there was a Brady violation. This should have been given earlier. This may have been egregious and all that. But in the end, you say it didn't matter. Your Honor, we 100 percent agree, as we did at the outset in every appearance before Judge Nathan, that unquestionably the material was the three new pieces of information identified on May 7th and then the district attorney cooperator notes from May 13th were Brady, and they should have been turned over earlier. But as Judge Nathan properly found, based on a very substantial record and based on very thorough and extensive questioning, and I don't think you have to take my word for it because as the prosecutor being there, you can read it in the record. So you're darn lucky. You're saying we're darn lucky that we had a judge like Nathan. Who? Judge Nathan was very thorough and conscientious and very skeptical of the government throughout this proceeding in a way to ensure herself, both through questioning of the line assistants and the chief of the criminal division, that what happened in this case was a very, very bad mistake by the government, but not bad faith and not willful misconduct, and it was something that could be cured and was cured by the four-month adjournment. And I also want to point out, because I think Judge Manasci asked a number of these questions, there is a moving target here from the defendants, both before Judge Nathan and before this court, about what the prejudice was and what they could have presented but were unable to. Judge Nathan made very careful findings in the record that it was pure speculation that any evidence at all that could have been available to the defendants existed and wasn't found. It starts with the identities of the individuals that are disclosed in the DEA report that's turned over before trial. Maybe you don't think it's enough, but there is a prejudice in having to change your theory or change the nature of the case you're going to put on very close to the trial, right? But that's actually not what happened, Your Honor, because, as Judge Nathan found, the government timely disclosed the fact that somebody else, Gabriel Guillen, who was then identified, confessed to the murder. The new piece of it was just the names of some of the individuals involved. And the defense had been saying way earlier than when they got the untimely production that they intended to advance an alternative perpetrator theory. Now, Mr. Langrock, he's appellate counsel. He's come in. He's looked at it with fresh eyes. He's talking about what he would have done if he was defense counsel. But these defendants had, each of them had three or four very experienced members of the bar here on the CJA panel who put forward a very vigorous alternative perpetrator theory that they had been planning before because, again, the government completely agrees that there were specific facts in that report that should have been turned over sooner, but the fact of the confession had been turned over in December of 2017. That was five months before the trial was originally scheduled to begin. So this is not a case where the theory had to change or where they had to have more difficult conversations with their clients. And another point that I would just make, Your Honor, is that when it comes to what kind of investigation the defense could do with either the three specific pieces of new information or even the information that was disclosed in December 2017, because of the nature of this case, because this was a case not like many cases that the United States Attorney's Office Violent Crime Unit investigates where you have a murder that starts being investigated by the office the night the murder happens, the crime scene that night was preserved. You have six months of video from April to September of everybody going in and out of the shop. You have LPR data from the shop. You have all of the cell phone activity off of all of the cell towers in the vicinity of the shop on the night of the murder and the location where the victim's body and car were found. That allowed the defense to test any theory that they wanted, whether it was specific alternative perpetrators identified in the Guillen confession or literally any other possible alternative perpetrator against that evidence. They had that benefit. This is not, as Mr. Langrock says, a cold case where they weren't able to go back and do it. It was all there for them. And the reason why nothing was found is because nobody else was there except for the two defendants. So there was no prejudice. Judge Nathan made that clear at 540 and 515 of the record, I believe. That was during one of the conferences. And she also found in particular that when it comes to the ability to speak with particular individuals, the individuals named in the confession were all drug dealers engaged in wide-scale drug dealing and violence. And the idea that they would have just openly talked to a defense lawyer or investigator about some murder that they didn't have any involvement in is pure speculation. And as I think Judge Monashie pointed out, by August of 2017, they had already all been indicted federally. Counsel, I think we hear you on that. Could you address the first counsel on the other side's statement, argument, that this was so egregious and part of an egregious pattern that whether we like exclusionary-type rules or not, our law says the government must be punished to see that they don't do it again because there are too many cases where this happened? Certainly, Your Honor. So a few points on that. The first one is, again, there is no question that the government made mistakes in this case. But Judge Nathan made very careful and thorough findings on an extensive record that contradicts Ms. Meyer's characterization of the government's conduct here. It simply was not bad faith, outrageous government misconduct. But if you have several cases where the same sort of thing happened in the same office and some of them were found to be intentional, can we say that Judge Nathan's finding that this was merely negligence, which is a finding one wouldn't want to make so that if there wasn't prejudice, the trial could go forward, was erroneous? And that's our job to look and see whether this judge who has a trial senses from what's going on that these people are guilty and would prefer not to throw the whole thing out, even though there's this and this and this and mighty bad behavior in this case. Your Honor, I would say that, first of all, with respect to whether or not that remedy is even available absent prejudice, I think both Walters and Bank of Nova Scotia made clear that it's not a means to circumvent harmless error analysis. But even putting that aside, there is no question that there are some cases that the office has brought where there have been discovery errors. Some have been on the level of requiring dismissal of the case, like the Najad case. Those are not the same type of errors that were made in this case here. And Judge Nathan specifically addressed this issue of punishment and deterrence and found that there absolutely needs to be, there is absolutely a need for deterrence. She completely recognized that. But, as I submit, she properly recognized that does not translate into simply dismissing indictments when the record does not support doing that. And that's at... What's the line you're drawing between the types of errors that justify it and the ones that don't? I'm not drawing a line or a distinction. But in this case, what Judge Nathan found and what the record supported was that where you have a case where the finding is of negligence and there are serious charges with strong evidence that the defendants have in fact committed the crime, that is not the case where dismissal is an appropriate punishment. And Judge Nathan... Her focus on this negligence, that faith thing. But if, you know, the office were negligently withholding written material in case after case, that would be as much of a problem as if it were that faith, right? I agree, but that's also not the record before this court. So I guess maybe... So the opposing counsel said that there's the pattern. Is there a pattern of the withholding written material? No, there is not a pattern. And it is unfortunate that there were two cases before the same judge close in time, but what happened in those two cases, the facts of those two cases are very different. And, again, I think Judge Calabresi may have touched on this, which is that what Judge Nathan showed, which is something that was recognized by this court in Walters, is that the district court judge is in a good position to determine what remedy would not result in a windfall to a defendant who has received a fair trial. And here Judge Nathan has had two cases in front of her where she has looked at them and ultimately concluded that they have different sets of circumstances. And there can be different remedies based on the type of violation. And in this case, the appropriate remedy was not to dismiss the indictment because there was no finding of willful misconduct or bad faith. The law even makes clear that even in a case of intentional withholding, that's not necessarily the remedy. And by adjourning the trial for four months, giving the defense whatever investigative resources they need, having the government, as Judge Nathan said, go above and beyond their obligations to cure this error because we recognized we made the mistake and we went bent over backwards to give them whatever information they wanted from whatever case we had regardless of whether we had an obligation to do it. There's still a problem that there was no sort of punishment or deterrence, even in what Judge Nathan did, and the fact that Najad happened a year or two later. Well, again, the facts that were underlying Najad, I think, I don't know if I'm remembering this correctly, but it's not like the case happened in Pizarro and Rivera and then subsequent to that, actions took place in Najad. Najad was a long-running case, and whatever problems were occurring in that case, I believe had started even before. The timeline is more mixed. It's more mixed. And again, look, I totally recognize that. We shouldn't conclude that the government said we got away with it in this, and so we'll try it again. That's absolutely right, and I think the record makes very clear that Judge Nathan, you know, seriously questioned the credibility of the prosecutors publicly, talked about it with her colleagues. This was something that was very significant and very personal for the prosecutors in this case and something that caused a lot of sleepless nights and a lot of lessons learned for both the prosecutors and this office. But at the end of the day, dismissal of the indictment on these facts is absolutely not the proper remedy, and Judge Nathan properly determined that based on proper, thorough findings of a very extensive record before her. Thank you. If any of the members of the Court have any questions, I'll be happy to answer them. If there are not, I'll rest on my grave. Thank you. Thank you. Thank you. Mr. Lindrock. Yes, just a couple things. Judge Galbraith, you were asked what evidence of murder. You were not told the truth. There is no evidence that the perpetrators from the time on were the two defendants in this case. They were not identified. When he speaks, they walked out of the car. Two perpetrators walked out. Two men from the pictures were over six feet tall in black who were not recognized, who were Shishkin's testimony changed. The reason I, let me just tell you my thinking. I've been before this Court. So their car was there. What? You don't dispute that their car was there. Their car was there. So you're just saying that the people who walked out of the car were not them. The evidence, no, the evidence is overwhelming, up to the point that they were going to do this. On the same day. They've been there. They're going to fail at that thing. They've done it 12 times. As an argument for prejudice because of the Brady violation. But, like, a jury could conclude that because their car was there that day and the perpetrators went in that day, it was the same people. Yep. Right? The people that went in were not my clients, but my clients. I understand that's your position, but a jury could conclude that they were. Excuse me? Would a reasonable jury be forced to conclude that they were not your clients? Yeah, I think so. The point I'm trying to make here, I've been arguing actual innocence. And, you know, it's very nice that they've got their lost people nights. My guys are doing life in prison. I think for something they didn't do. The situation here is the – I would love the court to, when it looks at the record, just to sit back and say, what's the chances here of this being, in common sense, an assassination versus being a robbery? Okay. You are saying that even though we have no direct evidence of anyone else being there. And they were there, it was their car. A history of planning robbery and only planning robbery with some events that happened. And though there is no evidence of somebody else specifically coming there, except as brainy evidence, that that is enough. I don't think that's – I think there is evidence. I think it's misinterpreted. I think if you look at the people walking in there, if you listen to Shishkin's testimony the original time, when he said there were two – There is that evidence of difference. I mean, there's stuff that goes there. The thing is that I'm well aware that you're also often presented with cases which say they didn't prove their case. And what I'm saying to you here is common sense. Everybody I've talked to, just take a look at this. This is an assassination. This is a protection. The cops were the involvement that killed this guy because he was going to be a witness. This wasn't a robbery gone wrong. It doesn't make sense to be a robbery gone wrong. They didn't try to rob him. They walk into this – they say to the two people there, we're not here for you. The concept that he blurted out, I'm a federal informant. No, they just don't make any sense. And if you look – not that you have to redo this situation, but when you fashion a remedy, I'm not asking you to say that the evidence is – I think it is, that it should be thrown out. But that should give you the problem we have as defense counsel in this case and what could have possibly been done. This could have been marshaled in an entirely different fashion. And I really ask, take a look. The presumption of innocence is great. Rumpel talks about going through this history of common law. But sometimes it doesn't work. Sometimes it just doesn't work. And this time the jury got it wrong. Thank you. Thank you. Thank you all. We'll take the case under advisement.